# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 24, 2010

## STATE OF TENNESSEE v. DAVID WILLIAM COSGRIF, III

**Direct Appeal from the Criminal Court for Roane County**
**No. 12963B     E. Eugene Eblen, Judge**

---

**No. E2009-02547-CCA-R3-CD - FILED OCTOBER 21, 2010**

---

The defendant, David William Cosgrif, III, was convicted by a Roane County jury of second degree murder, a Class A felony, and theft over $1000, a Class D felony, and was sentenced by the trial court as a Range I offender to an effective term of twenty years in the Department of Correction.  He raises essentially three issues on appeal:  (1) whether the evidence was sufficient to sustain his second degree murder conviction; (2) whether the trial court erroneously admitted scientific testimony that did not meet sufficient indicia of reliability; and (3) whether the trial court imposed an excessive sentence for the murder conviction. Following our review, we affirm the judgments of the trial court but modify the defendant's sentence to fifteen years.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, David William Cosgrif, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Russell Johnson, District Attorney General; and Frank Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This case arises out of the murder of a seventy-six-year-old woman, Kathleen Taylor, whose decomposed remains were found in rural Roane County on December 27, 2003,

approximately two years after she mysteriously disappeared from her Harriman home. The defendant, who lived with the victim, aroused the suspicions of police by the fact that he remained in her home after her disappearance, forged checks drawn on her bank account, used her debit card and vehicle, and offered varying stories to account for her whereabouts and his possession of her property. Eventually charged with the first degree premeditated murder of the victim and two counts of theft over $1000, he was tried before a Roane County jury from July 7-9, 2009.

## State's Proof

Alex Zamisz, the victim's grandson, testified that his brother, Chris Zamisz, and the defendant, who was Chris's friend and possibly his lover, moved in late 2001 with the victim from Texas to Harriman, Tennessee, where the victim bought a home that Chris Zamisz and the defendant were supposed to be remodeling. Zamisz stated that his brother, Chris, came back to Texas a few days after the victim's move to Tennessee and, due to a severe ankle injury that left him bedridden for a time, remained there until the summer of 2002 when the defendant picked him up and took him back to Tennessee.

Zamisz testified that the last time he spoke to the victim was shortly after her move to Tennessee. He said he heard from his brother in February 2002 that the victim had gone to Florida for knee surgery and from the defendant in the summer of 2002 that the victim was still enjoying her visit with her friends in Florida. He stated that the defendant was evasive when he asked how to get in touch with the victim, telling him that the victim was still recuperating and did not want to talk to anyone.

Zamisz testified that the victim was heavyset but had had no difficulty climbing the stairs in his home when she visited him immediately before her move to Tennessee. He said he had never known the victim to use a computer or email. When, however, he expressed renewed concern for her welfare after six months had elapsed since he had last heard from her, his brother forwarded him an email that purportedly had been sent by the victim to his brother at the Harriman home. In the email, the victim stated that she was fine but did not want to be bothered by her family. The victim also threatened to cut the family out of her will if they persisted in bothering her. According to Zamisz, the victim "would never talk like that." He described the victim as a woman who was tight with her money and said that she was particular about whom she allowed to drive her pickup truck. He also said that he had never heard of Ed and Marge Carroll, the friends with whom the victim was reportedly staying in Florida.

Michael Goins, who was a lieutenant with the Harriman Police Department in July 2002, testified that on July 2, 2002, he was sent to perform a "welfare check" on the victim

at her Harriman home. He said that the defendant and Chris Zamisz, who answered the door together, told him that the victim had gone to Florida for knee surgery. They were unable, however, to provide him with her contact phone number, address, city, the names of the individuals with whom she was staying, or the hospital at which she had had her surgery. He said he asked the men about the activity that was taking place on the victim's debit card, and they explained that they had permission to use the account because they were remodeling the residence. Goins testified that sometime later he responded to a hang-up 911 call from the residence, asked to search the home, and found an individual hiding in the closet. He saw no signs of the victim, however, and no complaint ever arose as the result of that call.

Mark McKinney testified that he was hunting in a wildlife management area in Roane County early on the morning of December 27, 2003, when he noticed a human skull on the ground approximately thirty feet from the woods road he had used to access the hunting area.

Lieutenant Robert Anderson of the Roane County Sheriff's Department testified that he responded to McKinney's December 27, 2003, call about the skull, which was located in an area that was approximately two and a half to three miles from Riggs Chapel Road.

Deputy Robert Childs, Jr. of the Roane County Sheriff's Department testified that he collected into evidence the bones found on December 27, 2003, and turned them over to Dr. Jantz with the University of Tennessee Anthropology Department. He said that with the help of a cadaver dog, he and other officers found additional bones in the area on January 21 and January 23, 2004. On cross-examination, he testified that during his search on December 27, 2003, he discovered a shallow grave with a femur bone protruding up through the dirt, which was located between the gravel logging road and the skull.

Officer Kelly Jackson of the Kingston Police Department, who was formerly employed with the Roane County Sheriff's Department, assisted in the collection of the bones discovered by the cadaver dog on January 21 and January 23, 2004, and later delivered them to the University of Tennessee's Anthropology Department.

Dr. Lee Meadows Jantz of the University of Tennessee's Anthropology Department, who was accepted by the court as an expert in the field of forensic anthropology, testified that she determined that the recovered bones came from a human female of Caucasian or European origin who was at least sixty years of age. Although she had no dental records to work from, she was able to positively identify the remains as those of the victim by comparing the victim's frontal sinus cavity on an x-ray of her skull, obtained from her medical records, to the frontal sinus cavity on the x-ray of the skull found in the woods. Dr. Jantz explained that each individual's frontal sinus cavity, similar to his or her fingerprint, is unique and that she "made a positive match on at least eight points," which was a

significant number, in her comparison of the x-rays. She said that a colleague, Dr. Angie Christianson, had conducted a study to determine the likelihood of misidentification through comparison of frontal sinuses and "was able to show that it's simply not going to happen." She testified that Dr. Christianson had written a peer-reviewed article on the topic, which in 2004 was published in the <u>American Journal of Physical Anthropology,</u> a peer-reviewed magazine subject to scientific scrutiny and accepted in the scientific community of forensic anthropology. She said that Dr. Christianson had concluded the article with the following statement: "Each individual's frontal sinus outline is distinctly and quantifiably different at a highly significant level."

Dr. Jantz also noted the presence of healed nasal fractures on the skull that were consistent with the radiologist's report, contained in the victim's medical records, of nasal fractures that the victim had sustained during a home invasion in Chicago. Based on the evidence of rodent activity on the bones but the lack of evidence of "exfoliation," or flaking, Dr. Jantz estimated that the remains had been at the site "between one and two years minimum but no longer than five." She said she found evidence of unhealed blunt force trauma, which occurred at the time of death, to the left side of the skull and face. She further testified that she found three neck vertebra within the pelvic inlet inside the shallow grave, which indicated that the body "was allowed to decompose for a certain period of time" before burial at the site.

On cross-examination, Dr. Jantz acknowledged that DNA analysis was not performed on the bones. She said that her assistant and several of her graduate students confirmed her eight-point match of the sinus cavity x-rays and that no one senior to her at the university reviewed her work because she was the most senior member of the department. She testified that she used Dr. Christianson's paper to "show statistical probabilities" of her identification of the skull, and she acknowledged that Dr. Christianson was the only person who had published anything on that particular topic. She conceded that it was more likely that the blow that caused the blunt force trauma to the victim's head was delivered from someone standing either in front or to the side of the victim rather than behind her.

On redirect examination, Dr. Jantz testified that there were numerous published papers, some of which dated from the 1940's or 1950's, on the identification of individuals by their sinus cavities and that the purpose of Dr. Christianson's work "was to actually provide the statistical evidence that frontal sinuses can be used as a unique identifier."

James Kirkland testified that he became acquainted with the defendant, who introduced himself as "Kawika Taylor,"when the defendant stopped by his home as he was doing yard work. The defendant told him that his father lived in Hawaii and was a physician and a retired admiral with the United States Navy, and in later conversations he implied that

-4-

his family was wealthy. Kirkland never met the victim, but he recalled having heard that an elderly woman lived with the defendant at one time. He said that about four months after he met the defendant, the defendant introduced him to a young man that he identified as his nephew. Kirkland testified that he took the defendant on sightseeing trips to several areas of interest in the county, including some old coke ovens located on Rockwood Mountain past Jolly Road, where the defendant took photographs. On cross-examination, he agreed that the defendant, whom he described as a "non-violent person," was not as vigorous a man as he was.

John Bales testified that the victim, an older, "solid, pretty good size woman" of average height who appeared to weigh approximately 300 pounds, hired him to perform various repairs on her home. He said that the defendant, who called himself "Kawika Taylor," identified himself as the victim's nephew and that he initially consulted him about how he should perform the work. The victim, however, soon made it clear to him that it was her house and that she was the one who would direct his work. Bales said that, although heavy, the victim got around well and that he once saw her high on an extension ladder painting the gable underneath her roof.

Bales testified that after a few months he no longer saw the victim. When he later asked the defendant about her, the defendant told him she had gone to Florida to have knee replacement surgery. Bales said he continued to work at the home for only a few days after his last sighting of the victim; the defendant stopped calling him for repair work and it appeared to him that the defendant no longer wanted him at the house. Soon thereafter, he was driving by the victim's house when he noticed that some of the windows were covered with aluminum foil, which struck him as strange because the victim had expressed a desire for more light in the home. He also noticed that a young man and woman were staying at the house for a time.

Bales further testified that he was once riding a dirt bike on Riggs Chapel Road when he saw the victim's pickup truck being driven rapidly down the road and then saw the defendant pulled in beside an old abandoned house. He said he later asked the defendant what he had been doing, and the defendant replied that he was doing the taxes for a woman who lived out that way. Bales stated that he saw the victim's truck on that road on one or two other occasions as well.

Kimberly Dagnan testified that the defendant, who introduced himself as "Kawika Taylor," told her that he had inherited his home from his deceased grandmother. She said that she and her husband later moved into the home at the defendant's request to help him fix it up. The arrangement only lasted a couple of months, however, because the defendant had a volatile personality, appearing calm one minute and becoming enraged the next.

According to Dagnan, the defendant kept a locked room in the house and "would flip spastic about it" if anyone approached it. She never saw the victim and never heard the defendant mention anything about anyone having knee surgery.

Cynthia Gouge, who in 2002 lived next door to the victim's Harriman home, testified that the defendant introduced himself as "Kawika Taylor" and told her that he was the victim's nephew. In addition, he said that his father was a heart surgeon, that he had a large trust fund and was very wealthy, that he had been born in Hawaii and had grown up in Oak Ridge, that his mother was wealthy and traveled extensively, and that he was related to Lady Bird Johnson. Gouge said she never met the victim but saw her outside the home approximately twice. The defendant later told her that the victim had bad knees and had gone to Florida for knee surgery. Gouge testified that at some point she met the victim's grandson, Chris, who was not as friendly as the defendant. She said that Chris and the defendant left sometime in July or August 2002, telling her that they were going to Cape Cod to get some money from their trust fund and that they would return. She stated that the men asked her to water their plants for a couple of days while they were gone, but they never came back. On cross-examination, Gouge acknowledged that the defendant was always pleasant and friendly.

William Gouge, Cynthia Gouge's husband, corroborated his wife's account of the tales the defendant told about his background and his relationship to the victim and testified that the defendant later accounted for the victim's absence by saying that she had gone to Florida to recover from a knee injury.

James Campbell testified that the defendant, who introduced himself as "Kawika Taylor," told him that he was an attorney from Corpus Christi, Texas, and had just purchased a home in Harriman. At a later point, however, the defendant changed his story, telling Campbell that he had inherited the home and that it was tied up in probate.

Tracy Liverman, who in 2001 and 2002 was an employee of the Harriman bank where the victim had deposited her money, testified that the defendant periodically came into the bank with the victim, but the victim never introduced him and never put him on her accounts. She said the last time anyone at the bank saw the victim was on February 25, 2002, when the victim came in to place a stop payment order on a check. The Department of Human Services later contacted the bank because the victim's daughters had filed a missing person's report on the victim, and at their request the bank cancelled the victim's debit card in July 2002. Afterwards, a man who was obviously attempting to disguise his voice as a woman's, and whom she recognized as the defendant, called her at the bank and, claiming to be the victim, told her that "she" had been traveling with a friend and was fine. A few days later, the defendant came into the bank to inquire in person about the cancelled card.

Agent Jason Legg of the Tennessee Bureau of Investigation testified that he was unable to uncover any record of the victim's having received any medical treatment, either in Florida or Tennessee, after January 2002 when she received a flu shot in Harriman.

Detective Thomas Bowler of the Pittsville, Massachusetts Police Department, who arrested the defendant in Pittsville, testified that when he explained to the defendant that he had been arrested on a fugitive from justice warrant that was based on a murder charge from Tennessee, the defendant responded that he did not understand why he was being charged with the victim's murder and that he had taken care of her and worked on her house. Detective Bowler stated that no one, at that point, had mentioned the victim's name to the defendant. On cross-examination, he testified that Chris Zamisz and a man named Richard Shipley were living with the defendant at the time of his arrest.

James Taylor, who had been housed in the same cell block as the defendant in the Anderson County Jail, testified that the defendant, who knew that Taylor's mother was an attorney, told him that the State's case against him was entirely circumstantial and inquired if Taylor's mother would represent him. The defendant then related that he and Chris Zamisz had come up with the idea to kill the victim for her money after the victim reneged on her promise to provide funds for the defendant to open a stained glass window business. The defendant said he had carried out the plan while Chris Zamisz was in Texas, taking the victim to the woods or the mountains under the pretense of looking at some houses to gain remodeling ideas for her home, hitting her in the head, and then hiding her body. According to Taylor, the defendant also related that he had moved the victim's body at a later point and that it was easier the second time "because she was so decomposed." Taylor testified that he found the defendant's revelations about killing a seventy-six-year-old woman and then moving her decomposed body disturbing, which was why he had contacted the police. He denied that he had been promised anything in exchange for his testimony and said that he expected to serve the remainder of his sentence for violating probation by driving on a suspended license.

On cross-examination, Taylor acknowledged having said in his statement to police that the defendant told him he had hit the victim in the head while walking behind her in the woods. He said the defendant never told him what he had used to hit the victim and that he never thought to ask him. He testified that the underlying offense for which his probation had been violated was possession of drug paraphernalia.

Chief Randy Heidle of the Harriman Police Department testified that within a day or two of the July 2, 2002, "welfare check" on the victim, he followed up by interviewing the defendant and Chris Zamisz at the victim's Harriman home, where the men gave the same account of the victim's whereabouts that they had given to Officer Goins. He testified that

in the written statement the defendant provided, he said that the victim had fallen and injured herself on the front walk on January 11, 2002, and on April 10, 2002 had left with her new friends, Ed and Marge Carroll, to go to Florida for knee surgery. The defendant also stated that the victim had been communicating with him via email at least once a week and that she had expressed fear that her daughters would take her assets and move her into a nursing home.

Chief Heidle testified that he obtained a search warrant for the victim's home after the defendant and Chris Zamisz left for Massachusetts in August. During the search, he discovered some areas in the backyard "where it looked like there had been some graves." He did not, however, find any of the victim's remains at the home. Chief Heidle testified that the wildlife management area where the remains were eventually found was in the same general area as Riggs Chapel Road and Jolly Road. He said he was unable to locate any dental records on the victim and learned from her family that she usually had dental work performed by students at dental schools. He stated that he was unable to find any individuals by the names of Ed and Marge Carroll. Finally, he testified that he did not recall any information having been released in the news about the grave site or the victim's body having been moved, which led him to believe that James Taylor had learned the details of the crime from someone with first-hand knowledge of the events.

On cross-examination, Chief Heidle acknowledged that a letter the defendant wrote to Taylor's mother contained none of the revelations that Taylor claimed the defendant had made to him but was instead consistent with the defendant's statement to Chief Heidle. He further acknowledged that the victim's bank statements showed only small cash withdrawals and purchases at stores like Walmart and Home Depot and that the C.I.D. unit of the Pittsville, Massachusetts Police Department, which had examined the victim's pickup, found no evidence that decomposed human remains had been transported in the vehicle.

**Defendant's Proof**

Bryon Goodman testified that he was a staff member at Miracle Lake Christian Training Center, a residential treatment center where the defendant had been admitted in April 2008 due, in part, to the fact that his health had been deteriorating while he was housed in the jail. Goodman said that the defendant had done well at Miracle Lake and had never had a conflict with anyone. On cross-examination, he acknowledged that he knew nothing of the defendant's state of health in 2002.

The sixty-six-year-old defendant, in often tediously lengthy testimony, described how he had befriended Chris Zamisz in California and let him move in with him. He said that Chris lived with him for approximately twelve years and eventually introduced him by

telephone to the victim. He described having bonded with the victim through their common experiences and said that when she expressed an interest in locating "a charming abode" to purchase in North Carolina or Eastern Tennessee, he offered to help her. He stated that he, Chris, and the victim drove around the area looking at numerous properties until they found the "magnificent" but run-down house in Harriman, which the victim purchased in October 2001 with the idea of restoring. According to the defendant, the victim had plans to set Chris up in business while she did "stained glass and . . . things in the community."

The defendant testified that he, the victim, and Chris Zamisz moved into the house together but that Chris returned to Dallas in November 2001 due to complications from earlier foot surgery. He stated that he and the victim were close friends but did not have a romantic relationship and that it was the victim's suggestion that he use the last name Taylor and identify himself as her nephew in order to avoid the appearance of impropriety in their living arrangements. The defendant explained that he used the first name "Kawika" because it was Hawaiian for "David."

The defendant testified that the victim met Ed and Marge Carroll, a well-dressed couple in their 70's, at a store in Oak Ridge and developed a fast friendship with them, which was why she agreed to go with them to Baltimore, Maryland, to see their physician after she fell and injured her knee in January 2002. He said the victim left with the Carrolls sometime around March 9, returned to Harriman on March 30, and then left with them again for Florida to have double knee replacement surgery. He stated that the victim made plans to recuperate from the surgery in the Bahamas while the defendant continued the restoration of her Harriman home. The defendant testified that he kept a weekly summary of the repairs performed on the home in the victim's absence and paid the workers, with the victim's permission, out of the victim's accounts. On May 10, 2002, he went to Texas to pick up Chris Zamisz and the two of them returned to Harriman together on May 12.

The defendant testified that he had shown James Taylor his copies of discovery, which included Dr. Jantz's report, while they were together at the jail. He denied that he told Taylor any of the things that Taylor related in his trial testimony. He testified that he never used the victim's account to make purchases on his own behalf and that he had only $500 or $600 at the time of his arrest. He stated that Chris Zamisz sold the victim's truck in Massachusetts and gave him $300 or $400 of the proceeds. The defendant denied having anything to do with the victim's murder and expressed his hope that she was still alive.

On cross-examination, the defendant testified that the Carrolls told him that they would be in touch and that he did not think to get their contact information from them. He said he later found their cell phone number and in July 2002 provided it to the Harriman Police Department. He stated that he did not recall having received any emails from the

victim, although he acknowledged having said otherwise in his statement to the police. He further acknowledged that he forged the victim's name to her checks and used her ATM card to withdraw cash from her accounts on multiple occasions. He insisted, however, that she had given him her permission to do so. He conceded that he also forged her signature to the title to her truck. However, he justified his actions by testifying that the victim had given the truck to Chris Zamisz in October 2001. Finally, he testified that he and Chris Zamisz left Harriman for Massachusetts because their lives had been threatened.

### State's Rebuttal Proof

Chief Heidle testified that the defendant never provided him with any phone number for Ed and Marge Carroll.

Following deliberations, the jury convicted the defendant of the lesser-included offense of second degree murder in count one of the indictment; the lesser-included offense of facilitation of theft over $1000 in count two, which charged the defendant and Christopher Zamisz with the theft of the victim's truck; and of theft over $1000 in count four of the indictment, which charged the defendant with the theft of funds from the victim's bank accounts.[1] The theft conviction in count two, however, was later dismissed due to the lack of proof as to the vehicle's value. At the conclusion of the sentencing hearing, the trial court applied the enhancement factor that the victim was particularly vulnerable due to age and sentenced the defendant as a Range I, standard offender to concurrent sentences of twenty years for the second degree murder conviction and three years for the theft conviction.

### ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his second degree murder conviction. He argues that the State failed to prove he had the requisite *mens rea* for second degree murder and that the evidence, aside from the testimony of James Taylor, was entirely circumstantial and insufficient to exclude every reasonable hypothesis other than his guilt. The State argues that the evidence was sufficient for the jury to find the defendant guilty of a knowing killing of the victim, and we agree.

---

[1]The third count of the indictment charged Christopher Zamisz with accessory after the fact based on his having helped the defendant avoid arrest, trial, conviction, or punishment for the victim's homicide. From the statements of counsel, we ascertain that Zamisz pled guilty for his role in the offenses.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether the defendant "knowingly" killed the victim is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the offense and from all the facts and circumstances surrounding the offense. See id. at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Viewed in the light most favorable to the State, the evidence was sufficient to show that the defendant committed a knowing killing of the victim. The State presented evidence

-11-

to show that the defendant continued to live in the victim's home after her disappearance, treated her truck and bank accounts as his own, repeatedly lied about her whereabouts, and concocted various tales to account for his presence in the home. The State presented further evidence to show that the elderly victim was killed by blunt force trauma to her head and that her body was moved at least once after it had begun to decompose. This latter evidence was consistent with the account of the crime that the defendant related to James Taylor, who testified that the defendant told him he lured the victim into the woods, hit her in the head, hid her dead body in one location for a period of time, and then moved it again after it had decomposed.

The defendant contends that the jury's having convicted him of second degree murder shows that it "totally discredited" the testimony of Taylor because the account he related of the crime was "the prototype of a first degree premeditated murder." The defendant further contends that without the testimony of Taylor, the evidence against him is entirely circumstantial and insufficient to eliminate every other reasonable theory except his guilt. We respectfully disagree. The jury, in its determination of credibility, could have chosen to believe all, none, or part of Taylor's testimony. Thus, the jury could have believed that the defendant confessed the killing to Taylor but have been doubtful about the particular details provided in Taylor's account. As such, the jury could have reasonably concluded that the evidence, which included all of the defendant's suspicious activities surrounding the victim's disappearance, was sufficient to prove that the defendant knowingly killed the victim, but insufficient to prove beyond a reasonable doubt that the murder was premeditated. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for second degree murder.

## II. Identification of Remains

The defendant next contends that the trial court erred by allowing Dr. Jantz's testimony with respect to the method by which she identified the remains. Specifically, he argues that the trial court should have disallowed her testimony on the basis that the sinus cavity identification methodology she employed does not meet sufficient indicia of reliability for admission under Tennessee law.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 provides that expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

In McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 265 (Tenn. 1997), our supreme court recited several nonexclusive factors that a court may consider in determining the reliability of scientific testimony, including:

"(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation."

Brown v. Crown Equipment Corp., 181 S.W.3d 268, 274 (Tenn. 2005) (quoting McDaniel, 955 S.W.2d at 265). The Brown court identified two other factors that a trial court may consider in assessing the reliability of an expert's methodology: (1) the expert's qualifications for testifying on the subject at issue, and (2) the connection between the expert's knowledge and the basis for the expert's opinion. Id. (citations omitted).

"[T]he allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citing Murray v. State, 214 Tenn. 51, 377 S.W.2d 918, 920 (1964); Bryant v. State, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976); State v. Holcomb, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982)). As such, we will not disturb the trial court's ruling absent a clear showing that it abused its discretion in admitting the testimony. Id.; State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002).

Initially, we note that neither the transcript of the pretrial hearing at which the trial court ruled in favor of admitting the evidence nor Dr. Jantz's written report is included in the record before this court. It is the defendant's duty to prepare a fair, accurate, and complete record on appeal, see Tenn. R. App. P. 24(b), and when necessary parts of the record are not included, we must presume that the trial court's ruling was correct. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). We, therefore, agree with the State that the defendant has waived the issue by his failure to provide an adequate record for our review.

Even if not waived, the defendant would not be entitled to relief on the basis of this issue. Dr. Jantz testified that she held bachelor's, master's, and doctorate degrees in biological anthropology, was the head of the Department of Forensic Anthropology at the University of Tennessee, had been an instructor in forensic anthropology in the National Forensic Academy since 2001, had been doing case work since the mid to late 1980's, and had worked extensively at the "Body Farm," a premier research facility at the University of

Tennessee that was nationally known. Thus, she was clearly qualified as an expert in forensic anthropology. In addition, apart from her testimony about the identification of the victim by her frontal sinuses, a topic on which she said extensive research had been conducted and numerous scientific papers written, she identified the bones as those of a Caucasian woman at least sixty years of age who had nasal fractures that were consistent with fractures the victim had sustained. That evidence, combined with evidence that the remains were located in the same county from which the victim disappeared and were of an age consistent with the victim's last sighting, was sufficient for a jury to reasonably conclude that the remains were those of the victim.

### III. Excessive Sentence

Lastly, the defendant contends that the trial court imposed an excessive sentence for his second degree murder conviction. In support, he cites his lack of a criminal history, model behavior at the unsecured Christian residential center, advanced age, and deteriorating health.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn .Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by," certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

The trial court enhanced the defendant's second degree murder sentence from fifteen years to twenty years based on its finding that the victim was particularly vulnerable due to age and possible physical infirmity. The trial court's ruling states in pertinent part: "[T]he Court feels that the age of the victim does have a play into it. And maybe her physical health, maybe not, but her age at least and the Court does not feel that this would be a minimum sentence range."

Whether a victim is "particularly vulnerable" for the purposes of the enhancement factor is "a factual issue to be resolved by the trier of fact on a case by case basis." State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). Application of the factor is appropriate in cases where the victim's vulnerability "had some bearing on, or some logical connection to, 'an inability to resist the crime, summon help, or testify at a later date.'" State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001) (quoting Poole, 945 S.W.2d at 96). "The State is required to proffer evidence in addition to the victim's age to establish particular vulnerability; however, that evidence 'need not be extensive.'" Id. (quoting Poole, 945 S.W.2d at 97).

At the time the murder presumably took place, in early 2002, the victim, who by all accounts qualified as obese, was seventy-six years old while the defendant was approximately fifty-nine. In this matter, as we have set out, the trial court found that the victim was particularly vulnerable due to her "age at least." However, in Poole, our supreme court determined that the trial court had erred in concluding that a seventy-year-old who lived alone was particularly vulnerable simply because of her age and living status:

Without question, this 70-year-old victim living alone was vulnerable to the type of offense committed by the defendant. We do not hold nor do we believe otherwise. Yet given the inherent ambiguity in attempting to determine vulnerability solely from one's age, we are unwilling to engage in potentially unfounded presumptions. A person's age alone may have little or no bearing on size, strength or vitality. Thus, unless the State produces evidence of physical or mental limitations at the time of the offense, along with proof of the victim's age, it cannot be presumed that the victim was *particularly*

-15-

vulnerable based solely on her age.

Poole, 945 S.W.2d at 97-98.

We note that John Bales, a witness for the State, testified that the victim, in spite of her age and size, was able to get around well, and he related that he once had seen her on an extension ladder, painting a gable under the roof. Thus, based upon the holding in Poole, we are compelled to conclude that, although the victim was elderly and very obese, these facts alone did not establish that she was "particularly vulnerable," for sentence enhancement purposes.

Accordingly, we conclude that the trial court erred in enhancing the defendant's sentence to twenty years and modify the sentence to fifteen years.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but modify the defendant's sentence to fifteen years.

_____
ALAN E. GLENN, JUDGE